1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

Alison E. Chase (SBN 226976)
KELLER ROHRBACK L.L.P.
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Telephone: (805) 456-1496
Fax: (805) 456-1497
achase@kellerrohrback.com

Laura Gerber, *Pro Hac Vice forthcoming*
Matthew Gerend, *Pro Hac Vice forthcoming*
Karin Swope, *Pro Hac Vice forthcoming*
Garrett Heilman, *Pro Hac Vice forthcoming*
KELLER ROHRBACK L.L.P.
1201 Third, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Fax: (206) 623-3384
lgerber@kellerrohrback.com
mgerend@kellerrohrback.com
kswope@kellerrohrback.com
gheilman@kellerrohrback.com

*Attorneys for Plaintiff Jared Stark*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

JARED STARK, on behalf of himself and all
others similarly situated,

                     Plaintiff,

    v.

GOOGLE LLC; GOOGLE IRELAND LTD.;
GOOGLE COMMERCE LTD.; GOOGLE
ASIA PACIFIC PTE. LTD.; AND GOOGLE
PAYMENT CORP.,

                     Defendants.

No. 5:20-cv-8309

CLASS ACTION COMPLAINT

JURY TRIAL DEMAND

Plaintiff Jared Stark ("Plaintiff"), on behalf of himself and all others similarly situated,
brings this Class Action Complaint for damages and injunctive relief against Defendants Google
LLC; Google Ireland Ltd.; Google Commerce Ltd.; Google Asia Pacific Pte. Ltd.; and Google
Payment Corp. (collectively, "Google") for violations of Sections 1 and 2 of the Sherman Act, 15
U.S.C. §§ 1 and 2, for violations of California's Cartwright Act, Cal. Bus. & Prof. Code § 16700,
et. seq., and for violations of the Kansas Restraint of Trade Act, Kan. Stat. § 50-101, et seq. All
allegations other than those concerning the Plaintiff are based on information and belief.

## I.    INTRODUCTION

1.     In the United States, nearly 90 percent of a user's on-screen time on a mobile device is spent on a mobile application, or "app." Mobile apps are most often downloaded from an app store, which centralizes and curates the distribution of mobile apps.

2.     Google owns and operates the largest app store, Google Play. The Google Play store comes pre-installed on almost all mobile devices running Google's Android operating system ("OS"). The Google Play store offers users the choice of more than 2.96 million apps, and, in 2019, users worldwide downloaded those apps more than 84.3 billion times.

3.     To build this prodigious marketplace, Google represented that the Android OS would be maintained as "open" source software whereby anyone could create Android-compatible products without undue restrictions. But, as the app store grew and as Google's Android OS became the "must-have" operating software for mobile device original-equipment manufacturers ("OEMs"),[1] Google began to close its ecosystem through a series of restrictive agreements that were designed to (and did in fact) deter and eliminate competition in the market for Android mobile apps and in-app products ("the Android Mobile App Distribution Market").

4.     Google's anticompetitive conduct, described below, allowed it to extract supracompetitive profits from consumers—like Plaintiff and Class Members—who paid Google directly for mobile apps and in-app content purchased through the Google Play store. Indeed, the Google Play store contains more than 90 percent of Android mobile app downloads worldwide. Google charges a 30 percent fee on every mobile app purchased through the Google Play store and on every in-app purchase made through an app downloaded from the Google Play store. These fees helped Google to generate more than $21.5 billion in ill-gotten revenue.

5.     Plaintiff and Class Members have also been harmed by Google's anticompetitive scheme because: (1) developers set higher app prices due to the high costs imposed on developers by Google; and (2) app quality has been reduced as app developers generated lower

---

[1] European Commission Press Release, Antitrust: Commission fines Google €4.34 billion for illegal practices (July 18, 2018), https://ec.europa.eu/commission/presscorner/detail/en/IP_18_4581.

1    returns.

2        6.      Plaintiff seeks to recover the damages caused by Google's unlawful

3    anticompetitive conduct and to obtain an order enjoining Google from continuing to engage in

4    these unlawful practices.

5                        **II.      JURISDICTION AND VENUE**

6        7.      This Court has personal jurisdiction over the Defendants. Google LLC and

7    Google Payment Corp. are headquartered in this District. All Defendants have engaged in

8    sufficient minimum contacts with the United States and have purposefully availed themselves of

9    the benefits and protections of United States and California law, such that the exercise of

10   jurisdiction over them would comport with due process requirements. Further, the Defendants

11   have consented to the exercise of personal jurisdiction by this Court.

12       8.      This Court has subject-matter jurisdiction over Plaintiff's federal antitrust claims

13   pursuant to the Clayton Act § 16, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337. The Court

14   has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

15       9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Google

16   LLC and Google Payment Corp. maintain their principal places of business in the State of

17   California and in this District, because a substantial part of the events or omissions giving rise to

18   Plaintiff's claims occurred in this District, and because, pursuant to 28 U.S.C. § 1391(c)(3), any

19   Defendants not resident in the United States may be sued in any judicial district and their joinder

20   with others shall be disregarded in determining proper venue. In the alternative, personal

21   jurisdiction and venue also may be deemed proper under Section 12 of the Clayton Antitrust Act,

22   15 U.S.C. § 22, because Defendants may be found in or transact business in this District and a

23   substantial portion of the affected interstate trade and commerce was carried out in this district.

24                      **III.     INTRADISTRICT ASSIGNMENT**

25       10.     Assignment of this case to the San Jose Division is proper pursuant to Civil Local

26   Rule 3-2(c)(e) because a substantial part of the events or omissions giving rise to Plaintiff's

27   claims occurred in Santa Clara County, California.

## IV.   PARTIES

11.     Plaintiff Jared Stark is a natural person who resides in Leavenworth, Kansas. Plaintiff purchased and paid Google for one or more apps through the Google Play store and purchased and paid Google directly for in-app digital content through an app downloaded from the Google Play store within the last four years.

12.     Defendant Google LLC is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Way, Mountain View, California. Google LLC is a technology company that provides internet-related services and products. Since 2005, Google has owned and developed the Android OS for use in Android licensed mobile devices. Google LLC is also the owner of the Google Play store through which developers of Android mobile apps sell their mobile app and in-app products to Android-operated mobile device users. Google LLC contracts with all app developers that distribute their apps through the Google Play store and is therefore a party to the anticompetitive contractual restrictions at issue in this suit.

13.     Defendant Google Ireland Limited ("Google Ireland") is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and is a subsidiary of Google LLC. Google Ireland contracts with all app developers that distribute their apps through the Google Play store and is therefore a party to the anticompetitive contractual restrictions at issue in this suit.

14.     Defendant Google Commerce Limited ("Google Commerce") is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and is a subsidiary of Google LLC. Google Commerce contracts with all app developers that distribute their apps through the Google Play store and is therefore a party to the anticompetitive contractual restrictions at issue in this suit.

15.     Defendant Google Asia Pacific Pte. Limited ("Google Asia Pacific") is a private limited company organized under the laws of Singapore with its principal place of business in Mapletree Business City, Singapore, and is a subsidiary of Google LLC. Google Asia Pacific contracts with all app developers that distribute their apps through the Google Play store and is

therefore a party to the anticompetitive contractual restrictions at issue in this suit.

16.     Defendant Google Payment Corp. ("Google Payment") is a Delaware corporation with its principal place of business in Mountain View, California, and is a subsidiary of Google LLC. Google Payment provides in-app payment processing services to Android app developers and Android users and collects a 30% commission on many types of processed payments, including payments for apps sold through the Google Play store and in-app purchases made within such apps.

## V.     FACTUAL ALLEGATIONS

**GOOGLE MAINTAINS AN UNLAWFUL MONOPOLY IN THE ANDROID MOBILE APP DISTRIBUTION MARKET**

**A.     The Android Mobile App Distribution Market is a Relevant Product Market**

17.     A mobile app is a standardized piece of software that is optimized for use on a mobile device. In some mobile apps, users are charged money for access to digital content or services, to share content, to play games, or to make transactions for physical or digital goods and services (an "in-app purchase").

18.     Mobile apps may be pre-installed on a mobile device as a component of the OS by the OEM. Users can also transfer apps from another device through a process Google refers to as "sideloading." But the predominant way—by far—that consumers access mobile apps is through an app store, which itself may be pre-installed on the mobile device.

19.     Through an app store, a user may search, browse, find, review, compare, buy, download, and remove a mobile app without having to use a separate device, making it critical to a mobile device user's experience. The app store may also offer mobile app developers' tools and services that support the building of mobile apps for that app store.

20.     The rules governing an app store are typically set forth by the app store proprietor—here, Google—and concern things like the types of mobile apps permitted in the app store; the absence of malware; how users pay for mobile apps; and how revenue is distributed between the mobile app developer and the app store.

21.     Because mobile apps are built in a specific programming language and configured to run on a specific type of mobile device OS as "native apps," distinct and separate product markets exist for mobile apps specific to the relevant OSs. For example, native apps developed for Apple iOS only work on Apple mobile devices and native apps developed for Android OS only work on Android mobile devices. Apple's App Store and the Google Play store do not compete against one another because Android users cannot utilize iOS apps or the Apple App Store, and iOS users cannot utilize Android apps or the Google Play store. Consequently, Google's dominance of the Android Mobile App Distribution Market is not constrained by Apple's App Store and vice versa.[2]

22.     Similarly, web sites and web apps are not competitively significant alternatives to the Android Mobile App Distribution Market. Mobile apps provide a deeper, richer user experience as compared to websites and web apps. For example, mobile apps can provide additional, unique functionalities by accessing specific features within the mobile device's hardware and operating system, such as a camera or location services. Moreover, websites and web apps rely on an internet connection, whereas mobile apps may continue to function even when the mobile device loses internet access. Because of these intrinsic benefits, users overwhelmingly choose to access content and services on their mobile devices through mobile apps—including for basic communication, business transactions, entertainment, and news—even though mobile devices users could access that content on their mobile devices via the internet. In the United States, nearly 90 percent of user screen time on mobile devices is spent on mobile apps.

23.     The Android Mobile App Distribution Market is therefore a relevant market that is comprised of all the channels by which mobile apps are distributed to Android OS users.

---

[2] *See, e.g.*, *Google Android*, No. AT.40099, European Commission Decision (July 18, 2018) ("EC Google Android Decision") at ¶¶ 590–673, 763, https://ec.europa.eu/competition/antitrust/cases/dec_docs/40099/40099_9993_3.pdf.

**B.      The United States is the Relevant Geographic Market**

24.      The relevant geographic market for the Android Mobile App Distribution Market is the United States. App stores (and other app distribution channels) are broadly developed and distributed throughout the United States, as are the mobile apps contained within the app stores. Indeed, the Google Play store—and the apps downloaded through it—are available to Android users anywhere in the United States.

**C.      Google has Monopoly Power in the Android Mobile App Distribution Market**

25.      More than 90 percent of all app store downloads in the Android Mobile App Distribution Market are made through the Google Play store.

26.      Google has designed the Android ecosystem to discourage others from making available and users from downloading apps from sources other than Google Play. Google, as the proprietor of the Google Play store, has exercised its monopoly power by refusing to allow any rival app stores to be downloaded through the Google Play store. Accordingly, there are only two ways by which an Android phone user may access rival mobile app stores: an (1) app store may be pre-installed on the mobile device; or (2) a mobile app store may be sideloaded onto the mobile device.[3] Google has thwarted meaningful user access for each.

27.      First, Google has successfully demanded and reached agreements with Android mobile device OEMs to require OEMs to pre-install and prominently display the Google Play store on the mobile devices they manufacture. Pre-installation is crucial because, as Google explains, "most users just use what comes on the device. People rarely change defaults."[4]

28.      Second, although users can theoretically sideload a third-party app store, Google has created guardrails designed to steer consumers away from sideloading. In order to sideload an app store, a user must go through a complicated multi-step process to download the app store to another device, load it onto the mobile device, and bypass multiple security and safety warnings set up by Google that suggest sideloading is unsafe.

---

[3] Theoretically, a user could use an app store like Google Play to download a rival app store. But Google has banned rival app stores from Google Play.
[4] EC Google Android Decision at ¶ 787(2).

29.     The difficulty of sideloading any app or app store was described by Epic, the maker of the popular mobile game *Fortnight*, in a recent lawsuit it filed against Google:

> Google ensures that the Android process is technically complex, confusing and threatening, filled with dire warnings that scare most consumers into abandoning the lengthy process. For example, depending on the version of Android running on a mobile device, downloading and installing *Fortnite* on an Android device could take as many as 16 steps or more, including requiring the user to make changes to the device's default settings and manually granting various permissions while being warned that doing so is dangerous.

30.     Even where a user persists and successfully loads a rival app store, Google discourages continued use of that app store by limiting some basic app functions that are available to apps downloaded through Google Play. For instance, apps downloaded through Google Play will automatically update in the mobile device's background. In contrast, updating an app through, for example, Amazon's Android app store requires a user to manually update each app through a multi-step process. By making the app update process difficult, Google further discourages users from seeking out rival app stores and the apps offered therein.

31.     By impeding (or interfering with) user access to third-party app stores, Google was able to extract supracompetitive prices for its Android app distribution services and for processing in-app purchases on apps downloaded through the Google Play store. Google has charged a 30 percent fee on sales of paid apps and a 30 percent fee for in-app purchases. Google collects and processes these fees directly from Plaintiff and Class Members, remitting the remainder of their payments to the mobile app developer. These fees generated more than $21.5 billion in global revenue for Google in 2018. If Google had operated the Google Play store in a competitive market, free of Google's anticompetitive restraints, then the fees that Google could have collected from Plaintiff and Class Members would be significantly lower. Indeed, the fees charged by alternative electronic payment processing tools—like PayPal and Square—are 2.9 percent and between 2.6 and 3.5 percent, respectively.

32.     Google has abused and maintained its monopoly power in the Android Mobile App Distribution Market through restrictive, non-negotiable agreements with mobile app developers, who must choose between complying with Google's draconian terms of use or

exiting Google's ecosystem. To have a mobile app listed on the Google Play store, mobile app developers must agree and have agreed with Google to ***not*** license their mobile app to any rival app stores. Indeed, Google's developer agreements mandate that developers may not "make available any product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play." This has enabled Google to secure the most desired and highest quality mobile apps while simultaneously foreclosing access to mobile apps by rival app stores. Mobile app developers must acquiesce to Google's demand because more than 90 percent of all Android mobile app downloads occur through Google Play.

33.     There are significant barriers to users switching mobile OSs.[5] In 2018, Consumer Intelligence Research Partners reported that more than 90 percent of Android users who bought a new mobile device purchased a new Android mobile device.

34.     Part of a user's lack of interest in switching is due to network effects. Google Android and Apple iOS have different operating concepts, user interface designs, and setting and configuration options. Users tend to pick one, learn it, invest in mobile apps and storage, and stick with it. Switching operating systems may entail the loss of compatibility with other smart devices designed to work in conjunction with the mobile device and its OS and the hassle of porting data from one OS to another. While mobile devices have a limited lifespan, and users might be expected to "break the lock-in cycle" when it is time to upgrade to a new device, users' reliance on software, data, and files, and other hardware and accessories that are only compatible with one product ecosystem, make it unlikely that they would switch to a non-compatible mobile device.

35.     Based on the foregoing, there is abundant evidence that Google has monopoly power in the Android Mobile App Distribution Market.

**D.     Google has Engaged in Anticompetitive Conduct in the Android Mobile App Distribution Market Resulting in Anticompetitive Effects**

36.     Google has implemented a multi-prong anticompetitive scheme to establish and

---

[5] EC Google Android Decision at ¶¶ 590–673, 763.

maintain its monopoly in the Android Mobile App Distribution Market and foreclose rival app store distribution channels. As a direct result of Google's anticompetitive scheme, it has charged supracompetitive prices for mobile app and in-app purchases.

**E.      Google's Anticompetitive Restraints on OEMs**

37.      Google has imposed and OEMs have agreed to anticompetitive covenants in Google's Mobile Application Distribution Agreement ("MADA"). This agreement, among other things, has required OEMs to:

- License the entire suite of Google applications and services (such as Google Play Services, Google Chrome, Gmail, Google Search, Google Maps, and YouTube) as a condition for licensing the Android OS;

- Pre-install the Google Play store, as well as up to 30 other proprietary Google apps; and

- Place the Google Play store on or near the main "home screen page" in its default configuration.

38.      OEMs must agree and have agreed to Google's anticompetitive, restrictive terms and conditions; if they do not agree, they risk losing access to the Android OS. For example, in 2012 Acer partnered with Alibaba to release products on Alibaba's OS, Aliyun. When Google learned of this, it threatened to terminate its partnership with Acer. Acer subsequently abandoned its deal with Alibaba.

39.      The restrictive MADA terms and conditions substantially limit the ability of rival app stores to meaningfully compete against Google in the Android Mobile App Distribution Market. By requiring pre-installation and prominent display of the Google Play store, Google ensures that competing app stores are at a significant disadvantage the moment the user takes a mobile device out of the box. Google has acknowledged the competitive significance of pre-installation, noting that "[p]reloading remains valuable to users, and hence device manufacturers, despite full unbundling because most users just use what comes on the device. People rarely

change defaults."[6]

40.     For example, Epic, which makes the popular game *Fortnight*, tried to partner with LG, an Android-licensed OEM, to ease the restrictions by which users could download and play its game. But LG ultimately refused, informing Epic that its contract with Google required LG "to block side downloading off Google Play Store *this year*." (emphasis added).

41.     Google's restrictive MADA agreements have therefore foreclosed meaningful competition in the Android Mobile App Distribution Market, allowing Google to charge supracompetitive prices for mobile app and in-app purchases. The anticompetitive MADA agreements have also harmed Plaintiff and Class Members by limiting consumer choice. Absent Google's unlawful restraints of trade, OEMs would be free to negotiate with third-party app stores for prominent placement on the OEMs' mobile device home screens. Third-party app stores could then attract prominent app developers to their store. Plaintiff and Class Members would benefit from such competition through added choices and lowered costs for mobile apps and in-app purchases.

**F.     Google has Imposed Anticompetitive Restraints on Mobile-App Developers**

42.     Google has imposed anticompetitive contractual restrictions on app developers through its Google Play Developer Distribution Agreement ("DDA"). Each of the Defendants, except Google Payment, is a party to the DDA. Google imposes the anticompetitive contractual restrictions in the DDA to foreclose meaningful competition in the Android Mobile App Distribution Market, thereby ensuring rival app stores lack access to high-quality, in-demand mobile apps. Indeed, Google has refused to negotiate any provision of the DDA and has required all mobile-app developers to sign the DDA before Google will list their mobile app on the Google Play store.

43.     The restrictive provisions in the DDA include:

- Section 3.2 requires that mobile device app developers enter into a separate agreement with Google's payment processor, Google Payment, to receive payment

---

[6] EC Google Android Decision at ¶ 787(2).

for and from apps and in-app digital content;

- Section 4.1 mandates compliance with Google's Developer Program Policies. These Policies require, among other things, that mobile device app developers use Google's proprietary in-app billing for in-app game payments, as well as certain other digital in-app purchases;

- Section 4.5 mandates that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play"; and

- Section 8.3 broadly grants Google the right to remove any Android app it believes has violated any portion of the DDA.

44.     Mobile-app developers seeking access to Android users through the Google Play store have had no choice but to accept Google's demands or suffer precipitous declines in downloads and revenue due to a lack of access to users. Indeed, removal from Google Play could mean that basic functions, such as automatic updating of apps in the background, which is available for apps downloaded from the Google Play store, may be disrupted. Meanwhile, updating an app downloaded through a rival app store requires users to follow a multi-step, manual process each time an update is made available. The DDA thus enables Google to secure the most desired and highest quality mobile apps for itself while simultaneously foreclosing access to rival app stores.

45.     As the sole proprietor of the Google Play store, Google has exercised its gatekeeping power to constrain competition and foreclose rival access. Numerous market participants have complained to congressional staffers that Google uses arbitrary rule violations of various Google Play policies as a pretext for retaliatory conduct and to foreclose competition.

46.     In the absence of these unlawful restraints, Google would not be able to impose supracompetitive fees that drive developers to charge and users to pay higher prices for mobile apps and in-app purchases.

1

## VI.   ANTITRUST INJURY

2      47.    Plaintiff and Class Members have suffered antitrust injury as a direct result of

3   Google's unlawful conduct.

4      48.    Plaintiff and Class Members have purchased Android mobile apps and in-app

5   digital content directly from Google through the Google Play store.

6      49.    As described above, Google's restrictive contracts and anticompetitive practices

7   have foreclosed competition in the Android Mobile App Distribution Market and enabled Google

8   to charge Plaintiff and Class Members supracompetitive fees for mobile app and in-app

9   purchases.

10

## VII.   CLASS ACTION ALLEGATIONS

11      50.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this

12   action on behalf of himself and on behalf of the following class (the "Class"):

13          All persons in the United States who, within the relevant statute of limitations (the
            "Class Period"): (1) paid for a mobile app on the Google Play store; (2) paid
14          subscription fees for a mobile app obtained on the Google Play store; or (3)
            purchased in-app digital content from a mobile app that was downloaded through
15          the Google Play store.

16      51.    Excluded from the Class are the Court, Defendants and their parent, subsidiary,

17   and affiliated entities, and their officers, directors, employees, affiliates, legal representatives,

18   predecessors, successors, and assigns.

19      52.    Class Members are so numerous that joinder of all members is impracticable. Due

20   to the nature of the trade and commerce involved, there are, perhaps, tens of millions of

21   geographically dispersed Class Members, the exact number and identities of whom are known

22   exclusively to Defendants.

23      53.    Common questions of law and fact exist as to all Class Members and predominate

24   over any questions affecting solely individual members of the Class. The questions of law and

25   fact common to the Class include:

26          A.   Whether Google has monopoly power in the Android Mobile App Distribution

27             Market;

B.   Whether Google's contractual restrictions with OEMs furthered Google's monopolization of the Android Mobile App Distribution Market;

C.   Whether Google's contractual restrictions with mobile app developers furthered Google's monopolization of the Android Mobile App Distribution Market;

D.   Whether Google's conduct resulted in supracompetitive prices for Android mobile apps;

E.   Whether Google's conduct resulted in supracompetitive prices for in-app digital content purchases;

F.   Whether Google's conduct has been detrimental to Plaintiff and Class Members; and

G.   The appropriate Class-wide measure of damages.

54.   Plaintiff's claims are typical of the claims of the Class, as all Class Members were similarly affected by Google's common course of wrongful conduct in violation of federal and state law, as complained of herein. Moreover, the damages and injuries of Plaintiff and Class Members were directly caused by Google's wrongful conduct.

55.   Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel that is competent and experienced in class-action litigation. Plaintiff has no interests that conflict with (or is otherwise antagonistic to) the interests of other Class Members.

56.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in management of this action as a class action.

## VIII.   CLAIMS

### COUNT ONE — UNLAWFUL MONOPOLY OF THE ANDROID MOBILE APP DISTRIBUTION MARKET IN VIOLATION OF SHERMAN ACT § 2

57.   Plaintiff hereby incorporates all other paragraphs as if fully stated here.

58.   Google's conduct has violated Section 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign

nations." 15 U.S.C. § 2.

59.     The Android Mobile App Distribution Market in the United States is a valid antitrust market.

60.     Google has and continues to hold monopoly power in the Android Mobile App Distribution Market.

61.     Google has unlawfully acquired and maintained monopoly power in the Android Mobile App Distribution Market through the anticompetitive acts described in this Complaint, including, but not limited to: (1) leveraging its Android OS and Google suite of products to impose anticompetitive contractual restrictions in its agreements with OEMs; (2) requiring OEMs to pre-install and prominently display the Google Play store on the "home screen" of each mobile device; (3) requiring app developers to sign the Google Play DDA before any app is made available for download on the Google Play store, which DDA has mandated that app developers (a) "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play" and (b) must use Google's proprietary in-app billing for certain in-app purchases; and (4) blocking mobile apps offered outside the Google Play store from providing important functions, including automatic updating while an app is in the background, which is available for apps downloaded through Google Play.

62.     Google's conduct has had no legitimate pro-competitive justification considering its anticompetitive effects, and therefore it has unreasonably restrained competition in the Android Mobile App Distribution Market.

63.     Google's conduct has affected a substantial volume of interstate commerce.

64.     Google's conduct has had substantial anticompetitive effects, including increased prices and costs for mobile apps and in-app products charged to Plaintiff and Class Members.

65.     Plaintiff and Class Members have been injured and damaged by Google's anticompetitive conduct as Plaintiff and Class Members have been forced to pay supracompetitive prices for mobile app and in-app purchases.

66.     Plaintiff and Class Members have been further deprived of the ability to choose between mobile apps and in-app products on the Google Play store or lower-cost, third-party app stores that would have been available had Google not engaged in the misconduct alleged here.

67.     Plaintiff and Class Members have suffered and continue to suffer damages and irreparable injury. Such damages and irreparable injury will not cease until and unless this Court issues an injunction terminating Google's anticompetitive conduct.

**COUNT TWO — UNLAWFUL RESTRAINTS OF TRADE CONCERNING THE ANDROID MOBILE APP DISTRIBUTION MARKET IN VIOLATION OF SHERMAN ACT § 1**

68.     Plaintiff hereby incorporates all other paragraphs as if fully stated here.

69.     Google's conduct has violated Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

70.     The Android Mobile App Distribution Market in the United States is a valid antitrust market.

71.     As alleged herein, Google entered into anticompetitive agreements with third parties that have unreasonably restricted competition in the Android Mobile App Distribution Market.

72.     These agreements include the MADA agreements Google entered into with OEMs that condition access to Android OS on: (1) licensing the entire suite of Google applications and services (such as Google Play Services, Google Chrome, Gmail, Google Search, Google Maps, and YouTube); (2) pre-installing the Google Play store, as well as up to 30 other proprietary Google apps; and (3) prominently displaying the Google Play store on or near the main "home screen page" as the default configuration.

73.     These agreements also include the DDA agreements Google entered with mobile-app developers that, as a condition of having their app listed on the Google Play store, required mobile-app developers to: (1) "not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on

Android devices outside of Google Play"; and (2) use Google's proprietary in-app billing for certain in-app purchases.

74. These agreements have had no legitimate pro-competitive justification considering their anticompetitive effects and have therefore unreasonably restrained competition in the Android Mobile App Distribution Market.

75. Google's conduct has affected a substantial volume of interstate commerce.

76. Google's conduct has had substantial anticompetitive effects, including increased prices and costs for mobile apps and in-app products charged to Plaintiff and Class Members.

77. Plaintiff and Class Members have been injured and damaged by Google's anticompetitive conduct as Plaintiff and Class Members have been forced to pay supracompetitive prices for mobile app and in-app purchases.

78. Plaintiff and Class Members have been further deprived of the ability to choose between mobile apps and in-app products on the Google Play store or lower-cost, third-party app stores that would have been available had Google not engaged in the misconduct alleged here.

79. Plaintiff and Class Members have suffered and continue to suffer damages and irreparable injury. Such damages and irreparable injury will not cease until and unless this Court issues an injunction terminating Google's anticompetitive conduct.

**COUNT THREE — UNREASONABLE RESTRAINT OF TRADE IN THE ANDROID MOBILE APP DISTRIBUTION MARKET IN VIOLATION OF THE CALIFORNIA CARTWRIGHT ACT**

80. Plaintiff hereby incorporates all other paragraphs as if fully stated here.

81. Google's acts and practices detailed above have violated the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See* §§ 16720, 16726.

82. Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anticompetitive scheme.

83.   The Android Mobile App Distribution Market is a valid antitrust market.

84.   As alleged herein, Google has entered into agreements with third parties that have unreasonably restricted competition in the Android Mobile App Distribution Market.

85.   These agreements include the MADA agreements Google entered into with OEMs that condition access to Android OS on: (1) licensing the entire suite of Google applications and services (such as Google Play Services, Google Chrome, Gmail, Google Search, Google Maps, and YouTube); (2) pre-installing the Google Play Store, as well as up to 30 other proprietary Google apps; and (3) prominently displaying the Google Play Store on or near the main "home screen page" as the default configuration.

86.   These agreements also include the DDA agreements Google entered with mobile app developers that, as a condition of having their app listed on the Google Play store, required mobile app developers to: (1) "not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play"; and (2) use Google's proprietary in-app billing for certain in-app purchases.

87.    Google's conduct has had substantial anticompetitive effects, including increased prices and costs for mobile apps and in-app products charged to Plaintiff and Class Members.

88.   Plaintiff and Class Members have been injured and damaged by Google's anticompetitive conduct as Plaintiff and Class Members have been forced to pay supracompetitive prices for mobile app and in-app purchases.

89.   Plaintiff and Class Members have been further deprived of the ability to choose between mobile apps and in-app products on the Google Play Store or lower-cost, third-party app stores that would have been available had Google not engaged in the misconduct alleged here.

90.   It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California, and overt acts in furtherance of Google's anticompetitive scheme took place in California.

91.     Plaintiff and Class Members have suffered and continue to suffer damages and irreparable injury. Such damages and irreparable injury will not cease until and unless this Court issues an injunction terminating Google's anticompetitive conduct.

## COUNT FOUR — KANSAS RESTRAINT OF TRADE ACT

92.     Plaintiff hereby incorporates all other paragraphs as if fully stated here.

93.     Google's acts and practices detailed above violate the Kansas Restraint of Trade Act, Kan. Stat. § 50-101, *et seq.*, which prohibits, *inter alia*, combinations to create or carry out restrictions in trade or commerce, increase the price of merchandise, or prevent competition in the sale of merchandise, *id.*

94.     Google's conduct and practices have substantial anticompetitive effects in Kansas, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

95.     Plaintiff and Class Members have been harmed by Defendants' anticompetitive conduct in a manner that the Kansas Restraint of Trade Act was intended to prevent. For example, Plaintiff and Class Members paid more for Android apps and/or in-app purchases than they would have paid in a competitive market. Plaintiff and Class Members have also been injured because Google's unlawful monopolization of the Android Mobile App Distribution Market has extinguished their freedom to choose between the Google Play store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff and Class Members have also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff and Class Members have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

## IX.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Permanently enjoin Defendants from monopolizing the Android Mobile App Distribution Market;

B. Permanently enjoin Defendants from engaging in anticompetitive conduct in connection with its agreements with OEMs and app developers;

C. Award Plaintiff and Class Members treble damages for injuries caused by Defendants' unlawful conduct in violation of federal and state antitrust laws;

D. Award Plaintiff and the Class their reasonable attorneys' fees and costs; and

E. Grant Plaintiff such further relief as the Court deems appropriate.

## X.   JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all issues so triable.


DATED this 24th day of November, 2020.

KELLER ROHRBACK L.L.P.


By */s/ Alison Chase*
Alison Chase (SBN 226976)
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Telephone: (805) 456-1496
Fax: (805) 456-1497
Achase@kellerrohrback.com

Laura R. Gerber *Pro Hac Vice forthcoming*
Matthew M. Gerend *Pro Hac Vice forthcoming*
Karin B. Swope *Pro Hac Vice forthcoming*
Garrett Heilman *Pro Hac Vice forthcoming*
1201 Third, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Fax: (206) 623-3384
Lgerber@kellerrohrback.com
Mgerend@kellerrohrback.com
Kswope@kellerrohrback.com
Gheilman@kellerrohrback.com

*Attorneys for Plaintiff Jared Stark*

CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-8309

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27